Opinion delivered May 15, 1889.

No. 6376.

Tom Coffelt v. The State.

1. Robbery—Evidence—New Trial—Indictment for robbery having unnecessarily described the money of which the accused robbed the injured party as "lawful money of the United States of America," it was essential to the validity of the conviction that the kind of money be proved as alleged. The proof in this case, falling short of this requirement, does not support the conviction, and the accused should have been awarded a new trial.

2. Same—Variance.—The indictment alleges that the accused *took* the money from the person of F. The proof shows that the accused and another presented pistols at F., and demanded the money, and that F., in fear of his life or of serious bodily harm, and after being struck, delivered the money. The defense contends that this proof shows a delivery of the money by F. through fear, and, therefore, that there is a fatal variance between the allegation and the proof. But *held* that such a delivery is a *taking* within the purview of the statute defining robbery, and therefore there is no variance.

APPEAL from the District Court of Brown. Tried below before the Hon. J. W. Timmins.

This conviction was for the robbery of W. H. Flippin, under an indictment the charging part of which is set out in the opinion. The penalty assessed by the verdict was a term of ten years in the penitentiary.

W. H. Flippin was the first witness for the State. He testified that he lived in the northern portion of Brown county, Texas, and for twelve years had known the defendant, who lived with his father about three miles distant from witness's house. Defendant and Tom Price galloped their horses to witness's place about sundown on the evening of February 21, 1888. By the time the witness recognized them they had their pistols presented close to his face, and one of them said to witness: "Hand up your checks, God damn you! Dig up that pot you have got buried! It is money we want! Dig it up!—We know you have got it! Dig it up,—God damn you, dig it up!" Tom Price then struck witness over the head with a pistol, and witness handed him his pocket book, which he passed to the defendant. The said pocket book contained four twenty dollar gold pieces, one five dollar gold piece, two ten dollar bills, one five dollar bill, and five silver dollars, aggregating one hundred and fifteen dollars,—all of which was the personal property of witness and was taken from him by defendant and Tom Price without his consent. Defendant's face was partially covered by a handkerchief, but witness recognized him both by his uncovered features and his voice, and could not be mistaken as to his identity. Tom Price was not disguised. After securing witness's pocket book defendant and Price marched witness and his two sons, Lige and Robert, to a point fifty-nine steps from where the robbery was perpetrated, and at that point Price produced a bottle and asked witness if he would not take a drink of Coleman City's best whisky. Witness declined, when one of the parties asked him: "Do you know us?" Witness replied that he did not, being afraid to tell the truth. Tom Price was then a stranger to the witness.

Cross examined, the witness said that the defendant's father moved away from witness's neighborhood about three years before the robbery. Witness could not say that defendant lived with his father constantly during the four years preceding the latter's removal, but during that time he often saw the

defendant in that neighborhood. Defendant and Price were riding bay horses at the time of the robbery. Defendant was the man who ordered witness to "hand up his checks," etc. Price also ordered the witness to deliver the money. They were on their horses, with their pistols pointed at the witness's face. Price dismounted and came into witness's yard and received the pocket book from witness's hands. Witness knew Bob Westerman, who at the time of the robbery was living in the Pan Handle. He removed from Brown county to the Pan Handle two or three years before the robbery, but was in the county a few days before it occurred. Witness met and talked with him while he was on that visit. He did not recognize the said Westerman until he spoke. He thought at the time of the robbery that said Westerman was the party with defendant, and so stated to one or more parties afterwards. Price and Westerman were very much alike in build, and were about the same size and age. Witness then stated the several transactions in which he received the moneys of which he was robbed, but could not state the particular moneys or kind of money that he received in the several particular transactions, nor could he remember the dates of those particular transactions. Witness's sons, Lige and Robert Flippin, Lige's wife, and old man Douglass were at the witness's house at the time of the robbery. Robert was with witness at the time, and Lige was at the horse lot. Douglass and Lige's wife were in the house. The witness was kept in terror during the process of the robbery, and all of that time looked down the barrels of two forty-four calibre single action Colt's revolvers. Defendant and Price each wore a coat and black hat. Defendant's hat was over his eyes at first, but was afterwards pushed back. When defendant and Price started off with witness and his two sons, they said to witness: "Old man, tell your folks good bye." Price then said to defendant: "Let us shoot him." Defendant demurred, and the two rode off in a gallop. Soon after the robbery witness went with the sheriff to Cliff Westerman's house to see Bob Westerman. The Westermans were in bed but they got up, dressed, and received witness, the sheriff, and Deputy Sheriff Rushing. Cliff took witness off and said to him: "I understand that you charge that Bob is one of the men who robbed you." Witness made no reply to Cliff Westerman, but on the way home he said to deputy sheriff Rushing: "I believe I will go back and tell them that I thought Bob was

one of the men who robbed me until I got a second look at him." The witness did not, after he was released by defendant and Price, say to the parties at his house: "Do any of you know who they are." Old man Douglass did not say: "I recognized Tom Coffelt's voice as soon as he spoke." Soon after the arrest of Price witness went to Eastland to look at and identify him. On his way home the witness passed Irby's house, and saw Irby plowing the horse ridden by Price on the evening of the robbery. Irby said that his said horse was stolen from him some time before.

Lige Flippin was the next witness for the State. He testified that he had lived with his father, the prosecuting witness, in Brown county, for twelve years, during which time he had known the defendant. The witness first saw the defendant, on the evening of the robbery, about a mile from his, witness's, father's house. Witness was then on his way home. Defendant and Tom Price were in the brush about thirty steps from the road. Witness went on home. Soon after his arrival defendant and Price rode rapidly to the gate where witness's father was standing, covered him with their pistols, and in the manner stated by witness's father on the stand, demanded the surrender of his money. Price then dismounted, went into the yard, and received the pocket book from witness's father, and said to him: "Dig up your pot, God damn you! Dig it up." He then seized a handkerchief, tied it around the old man's neck, jerked it until it came off, and then struck the old man over the head with his pistol. While Price was jerking the old man around, the latter said: "You may kill me, but I have no more money." Defendant and Price then marched the old man, witness and his brother to a point about sixty yards distant, before doing which Price told the old man to bid all of his children good bye. After reaching the point indicated Price asked the old man if he knew them, and said that if the robbery was ever reported he and defendant would return and kill the old man, witness and his brother. He then offered a drink of whisky to his victim. Defendant wore a handkerchief over his face, which covered his features from his eyes down. Witness was positive that defendant and Price were the men who robbed his father.

On cross examination, the witness said that he recognized the defendant when he saw him in the brush before getting home. The defendant had the handkerchief over his face at

that time. He also had his hat pulled down over his eyes. When the old man handed Price the pocket book, Price said that he was not there to fool with that "little dab," but that the old man must dig up his pot. During the time that Price was jerking the old man around. the defendant held the witness at bay with his cocked pistol, repeatedly ordering witness not to move.

Robert Flippin, the twelve year old son of the prosecuting witness, testified, for the State, substantially as did his father and brother.

Old man Douglass testified, for the State, that he was so nearly blind that he was unable to recognize a person by sight at the distance of ten or twelve feet. He was at W. H. Flippin's house at the time of the robbery, and heard, but could not see, what transpired. He was confident that he recognized the voice of one of the men who perpetrated the robbery as that of the defendant. He could not, of course, otherwise swear to the identity of the defendant. When old man Flippin returned to the house after the robbery he asked: "Do any of you know either of those men?" Witness replied: "I took one of the voices as that of Tom Coffelt." He was the first to suggest defendant's name.

On his cross examination, the witness said that he was in a violent fright at the time of the robbery, and could not swear positively to the voice of defendant, but was satisfied in his own mind that one of the voices was his.

The State closed.

The defendant's first witness was N. A. Perry, sheriff of Brown county. Mr. Perry testified that Tom Price was now a prisoner in his custody. The said Price was a young man about twenty-one years old, tall and straight in stature, with dark hair, keen dark eyes, high thin nose, prominent features, and on the whole a rather "good looking" young man. He knew Bob Westerman, who was now in the court room. The said Westerman was of short stature, heavy build, with round shoulders, round fat face, short nose, of lighter complexion than Price, and about twenty-three or twenty-four years old.

W. H. Roach testified, for the defense, that he lived at the town of May, about twenty miles north of Brownwood. Witness remembered the reported robbery of Mr. W. H. Flippin, which was said to have occurred on the evening of February 21, 1888. The robbery of the bank in Cisco occurred a day or

two before the robbery of Flippin. The witness was at Sipe Springs, about ten miles from May, about a week after the Flippin robbery. While witness was at Sipe Springs, Tom Price was brought in under arrest, being charged with the robbery of the Cisco bank. He was riding a bay horse which Mr. Irby, who was then in the said town, identified as a horse that was stolen from him six or seven weeks before. Price was held on the charge of stealing Irby's horse, and not on the charge of robbing the bank.

Jo Coffelt testified, for the defense, that he now lived, and for ten years past had lived, in Tom Green county, about eighteen miles north from San Angelo, and about one hundred miles from Brownwood. He was now living with Mr. Barfield. Defendant, who was witness's brother, also lived in Tom Green county, and at the time of his trial had lived there seven or eight years. Witness and defendant left Tom Green county on February 8, 1888, to go to Colorado City, in Mitchell county, Texas. They reached Colorado City on February 10, remained there until the fourteenth, when they went to Mr. Holloway's place, about twenty miles from Colorado City. The witness remained at Holloway's and defendant went on toward "home." Witness got home on the eighteenth of the month. remained on the nineteenth and perhaps the twentieth, and left, going on the twentieth or twenty-first to Lum Hudson's, where he remained until the last of the week. Hudson lived in Tom Green county, about sixteen miles north of San Angelo, and about half a mile from Norfleet's house. Witness's horse escaped from him on the night of February 21, 1888, and witness left Hudson's on the morning of the twenty-second on foot, to look for him. He took dinner that day at Norfleet's. Immediately after dinner the defendant rode up to Norfleet's and witness borrowed his horse and continued the search for his own horse. He found his said horse on the next day, February 23, and took defendant's horse to Norfleet's house, where defendant still was.

On his cross examination the witness verified the dates mentioned in his testimony by various incidents. He testified that, when he and defendant left Tom Green county on February 8, to go to Colorado City, he had not seen Tom Price for quite a month. Witness and defendant separated at Holloway's, near Colorado City, on the fifteenth or sixteenth of February, and witness did not see defendant again until he came to Norfleet's house, in Tom Green county, about noon on February 22.

When they separated at Holloway's defendant wore off the witness's white Stetson hat, and rode the witness's sorrel pony. He came to Norfleet's on February 22, wearing the same hat and riding the same pony. Defendant was arrested in Coleman City on March 8, 1888, while en route to Baird as an attached witness in a case pending at Baird.

Lum Hudson testified, for the defense, that he lived in Tom Green county, Texas. He knew defendant and his brother Jo Coffelt, both of whom also lived in Tom Green county. Jo Coffelt came to witness's house on Monday, February 20, 1888, and remained there until the end of the week. Defendant ate supper at the witness's house on the evening of February 23. Jo Coffelt's horse escaped from him while at witness's house. Jo left on foot to hunt for that horse and returned to the house that night riding a small sorrel pony. He found his escaped horse on the next day. On cross examination the witness said that he remembered the date on which defendant ate supper at his house by reason of the fact that, when defendant got there, he said that he was on his way to the party at the house of one Wilson, who lived in the neighborhood, and that party occurred on the night of February 23, 1888. When he came to witness's house that night defendant was wearing a white hat and riding a sorrel pony.

Jasper Norfleet testified, for the defense, that he lived in Tom Green county, about sixteen miles from San Angelo, and about one hundred miles from Brownwood, in Brown county. Defendant was at witness's house on the sixteenth and seventeenth days of February, 1888. Witness saw him two days later—February 19—at the OL ranch, between witness's house and San Angelo. He came back to witness's house on the twenty-second day of the same month, and was there on the twenty-third. Of these dates witness was positive. Besides the defendant the two Coffey boys and Mr. Butten ate dinner at witness's house on February 23.

Frank Norfleet, for the defense, corroborated the statement of the preceding witness, who was his father, adding that Tom Price was with the defendant when he saw the defendant at the OL ranch of February 19, 1888. In coming to Norfleet's house on the twenty-second of February, defendant came from toward Mr. William Cowley's house.

William Cowley and his son Tol Cowley testified, for the defense, that they lived about three miles from Norfleet's house

in Tom Green county, Texas. Defendant came to their house on Monday, February 20, 1888, remained that day and night and the next day and night, and left on the morning of February 23, 1888. They next saw defendant at Wilson's party on the night of February 24, 1888. Wilson lived on William Cowley's place.

*Scott & Jenkins*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for robbery. The indict-ment charges that appellant "did then and there, in and upon the body of W. H. Flippin, make an assault, and did then and there by said assault and by force and violence to the said W. H. Flippin, in fear of life and bodily injury, fraudulently and without the consent of the said W. H. Flippin, take from the person and possession of the said W. H. Flippin, who was then and there the owner thereof, five certain twenty dollar gold pieces of the value of twenty dollars each, good and lawful gold coins of the United States of America; also one certain five dollar gold coin, good and lawful money of the United States of America, of the value of five dollars; also two ten dollar bills of the denomination of ten dollars each, good and lawful money of the United States of America, of the value of ten dollars each; also one five dollar bill of the denomina-tion of five dollars, good and lawful money of the United States of America; also five silver dollars, good and lawful money of the United States of America, of the value of one dollar each," etc.

Counsel for appellant assigns for error the overruling of the motion for new trial based upon the insufficiency of the evi-dence to support the verdict, "because there was no evidence showing the kind or value of any of the money, as alleged in the indictment." All of the money is alleged to be the lawful money of the United States of America. It is contended that the proof fails to show that any of the money was the coin or bills of the "United States of America." Unquestionably this is a description of the coins and bills alleged to have been taken from Flippin, and hence a description of the particular offense charged against appellant. This being the case, while an unnecessary description, still it must be proved. (Childers v. The State, 16 Texas Ct. App., 527; Gray v. The State, 11

Texas Ct. App., 411; Cameron v. The State, 9 Texas Ct. App., 336; 21 Texas Ct. App., 212.)

The indictment alleges that the robbery was effected by an assault upon the body of Flippin, and also by force and violence to the said Flippin. There is no allegation that it was effected by 'putting him in fear of life or bodily injury." Something is said in the indictment about fear of life or bodily injury, but there is no allegation that Flippin was put in fear of anything.

The indictment alleging that appellant *took* the money from the person of Flippin, and the proof showing that Flippin delivered the money to the appellant, counsel for appellant contends that there is a variance, and that the allegation that appellant *took* the money is not sustained by the proof. What are the facts bearing upon this point? Flippin says that appellant and Tom Price galloped to his house about sundown; that the first he saw of them, to know them, they had their pistols in his face and said "hand up your checks, God damn you; dig up that pot that you have got buried. It is money that we want. Dig it up, we know that you have got it. Dig it up, God damn you, dig it up." Tom Price hit him on the side of the head with a pistol, and he gave Price his pocket book, and he handed it to appellant.

Now it is contended that this does not show a *taking* of the money, but a delivery of the money by Flippin through fear. A presents a cocked pistol toward B and demands his money. B, through fear of loss of life or great bodily injury, delivers to A his money. We are seriously told that A did not take B's money. The authorities and common sense say that he did *take* B's money. But counsel for appellant admits this would be a taking of the money but for article 723 of the Penal Code. This article has no reference whatever to the state of facts presented in this record. They are provided for in article 722. This is evident, because appellant and Price not only exhibited fire arms, but used them in the commission of the offense, and in such a case the punishment may be for life, while the penalty for a violation of article 723 is not less than two nor more than five years.

As the case will have to be tried again, we will not give our views on the evidence. Because the State failed to prove that the money taken was United States money, as alleged, the judgment is reversed and the case remanded for another trial.

*Reversed and remanded.*